# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**JESSICA J. WELLS,**

**Plaintiff,**

-vs-                                                       Case No.  **6:09-cv-1669-Orl-28DAB**

**COMMISSIONER OF SOCIAL
SECURITY,**

**Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

The Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) terminating her Supplemental Security Income (SSI) benefits when reviewed under the adult standard upon turning 18 years of age.

The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case.  Oral argument has not been requested.

For the reasons that follow, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **REVERSED** and **REMANDED.**

## I. BACKGROUND

### A.      Procedural History

Plaintiff was found to be disabled as a child[1] due to mental retardation and a secondary impairment of a visual disturbance, and was awarded SSI benefits beginning in 2001. R. 52. However, as required by social security law, eligibility for these disability benefits was redetermined under the rules for determining disability in adults when Plaintiff turned 18 years old.  R. 19.  The Social Security Act provides that individuals who are eligible for SSI benefits as children for the month preceding the month in which they attain age 18, must have their disability redetermined under the rules for disability used for adults; the definition of disability used for adults who file new applications for SSI based on disability must be applied.  *See* 20 C.F.R.§ 416.987; R. 50-51.

On August 10, 2007, it was determined that Plaintiff was no longer disabled as of the first of that month.  R. 69.  This determination was upheld upon reconsideration.  Plaintiff requested a hearing, which was held on February 27, 2009, before Administrative Law Judge Gerald F. Murray (hereinafter referred to as "ALJ").  R. 53, 367-84.  In a decision dated April 16, 2009, the ALJ found Plaintiff's disability ended on August 1, 2007 and Plaintiff had not become disabled again since that date.  R. 19-26.  Plaintiff timely filed a Request for Review of the ALJ's decision.  R. 13.  The Appeals Council denied Plaintiff's request on September 2, 2009.  R. 8.  Plaintiff filed this action for judicial review on September 29, 2009.  Doc. No. 1.  On October 22, 2009 the Appeals Council set aside its previous decision, considered new evidence, and determined it did not provide a basis for changing the ALJ's decision[2].  R. 4-7.

---

[1]Plaintiff originally filed an application of SSI on October 4, 2001 alleging disability from birth on March 5, 1989 R. 73.

[2]The AC's subsequent October 2009 decision was included in the Record, although decided after the Complaint was filed seeking judicial review of the September 2009 decision.

### B.   Medical History and Findings Summary

Plaintiff was born on March 5, 1989 (R. 73) and turned 18 in March 2007. Plaintiff's medical history is set forth in detail in the ALJ's decision.  By way of summary, at the time of redetermination on when she turned 18 years old, Plaintiff complained of borderline intellectual functioning/mental retardation, and visual disturbances, blurred vision, double vision, and migraines. R. 50, 52, 53.  After reviewing Plaintiff's medical records and Plaintiff's testimony, the ALJ found that, since August 1, 2007, Plaintiff suffered from borderline intellectual functioning and headaches, which were "severe" medically determinable impairments, but were not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  R.21-22.  The ALJ determined that, since August 1, 2007, Plaintiff had the residual functional capacity (RFC) to perform a full range of work at all exertional levels but must avoid ladders and scaffolds, and extremely heavy and dangerous or moving machinery; Plaintiff was also limited to simple, unskilled work.  R. 23.

In making this determination, the ALJ found that Plaintiff's allegations regarding her symptoms and limitations not credible to the extent she claimed she was precluded from all work activity. R. 24.  Plaintiff had no past relevant work. R. 25.  Considering Plaintiff's vocational profile and RFC, the ALJ applied the Medical-Vocational Guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, and concluded that Plaintiff could perform other work existing in significant numbers in the national economy. R. 26.  Accordingly, the ALJ determined that Plaintiff's disability ended on August 1, 2007. R. 26.

Plaintiff now asserts four points of error. First, Plaintiff argues that the ALJ erred in assessing the testimony of Plaintiff's mother, Martha Wells.  Second, she claims the ALJ erred by finding she had the RFC to perform full time work. Third, Plaintiff contends the ALJ erred by finding that there were other jobs in the national economy that Plaintiff could perform based on the grids even though

she had non-exertional impairments.  Fourth, Plaintiff argues the Appeals Council erred in failing to consider post-hearing genetic testing from the University of Florida Division of Pediatric Genetics which was timely provided by Plaintiff's counsel.  All issues are addressed, although not in the order presented by Plaintiff.  For the reasons that follow,  it is respectfully **RECOMMENDED** that the decision of the Commissioner be **REVERSED** and **REMANDED** .

## II.  STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – *i.e.,* the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004).  "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]" *Id.* (internal quotation and citation omitted). *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

Where an individual was eligible for SSI benefits as a child, the Commissioner must, for the month preceding the month in which she attains age eighteen, re-determine her disability. Social Security Act § 1614(a)(3)(H). A showing of medical improvement is not required in these redetermination cases. *Id*. Instead, the definition of disability used for adults who file new applications for SSI benefits based on disability applies. *Id*.

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. 20 C.F.R. § 404.1520(f).

## III. ISSUES AND ANALYSIS

### A. Plaintiff's residual functional capacity

Plaintiff claims that the ALJ should not have found her not disabled because she did not have the ability to work full-time due to frequent and significant headaches, citing Social Security Ruling 96-8p (stating that the issue at step five is whether the claimant has the residual functional capacity to perform work on a "regular and continuing basis," which means "8 hours a day, for 5 days a week, or an equivalent work schedule"); *Kelley v. Apfel*, 185 F.3d 1211, 1214-15 (11th Cir. 1999). Plaintiff

argues that the ALJ gave no consideration to the evidence she suffered from headaches.  The Commissioner argues the ALJ properly considered the objective medical evidence and determined Plaintiff's headaches were not disabling.

Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite her impairments.  20 C.F.R. § 404.1545(a); *Lewis v. Callahan*, 125 F.3d 1436,1440 (11th Cir. 1997).  The focus of this assessment is on the doctor's evaluation of the claimant's condition and the medical consequences thereof.  *Id.*  Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See Lewis*, 125 F.3d at 1440; *Edwards*, 937 F.2d at 583; 20 C.F.R. §§ 404.1527(d), 416.927(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

Plaintiff contends that there is evidence in the record indicating that she is unable to attend work eight hours a day, five days a week on a regular basis due to headaches.  Plaintiff argues that migraine headaches need not be proven by laboratory results, citing *Ortega v. Chater*, 933 F. Supp. 1071, 1076 (S.D. Fla. 1996).  Plaintiff contends that the ALJ erred in finding that Plaintiff is able perform the full range of work at all exertional levels without fully considering the evidence of her headaches in the record.  She cites Dr. Ludvigh's notes reporting that she experienced headaches 3-4 times a week (R. 205) and that she could be limited in job searching and vocational applications (R.

208); Dr. Graham also noted her history of headaches that can last two to three hours, up to all day, and can include nausea and vomiting. R. 279.

Plaintiff also points to Dr. Dinkla's notes that Plaintiff reported experiencing severe headaches three to four times a week, with significant light and sound sensitivity, vertical diplopia, which forced her to leave school or stop whatever she was doing, and go to sleep. R. 323. The significance of this argument is debatable: while Dr. Carinci noted these complaints in December, there is no letter from Dr. Dinkla stating this anywhere in the evidence of record. R. 333. Dr. Dinkla's name is on only one record, which, as discussed above, noted negative MRI results, normal functioning, and Plaintiff's reports that she took only over-the-counter medication. R. 328.

She relies on Dr. Carinci's diagnosis of a combination of tension type headaches with migrainous headaches, three to four times a week, that were "significantly impairing" her socially as well as scholastically, with daytime sleepiness (R. 334-35). Plaintiff also points to Dr. Perszyk's notation: "of additional concern for Jessica is the history of headaches with nausea and sometimes vomiting but often just the headaches that seemed to be severe enough to keep her from doing activities"; they seemed to be worsening over the years. R. 339-40.

The Commissioner correctly argues that the ALJ was entitled to rely on Plaintiff's physical examinations which showed generally normal physical findings and conservative treatment for her headaches. R. 24-25. The ALJ cited the unremarkable findings in Dr. Barber's July 2007 consultative exam. R. 24-25 (citing R. 273-77):

> [Plaintiff] complained of an inability to work due to headaches. At the time, the claimant indicated that she had migraines when she was stressed, hot or when she had her period. She noted that she had 2-3 headaches a week. At the time of the evaluation, Dr. Barber indicated that the claimant's cognitive functioning was adequate. The claimant was diagnosed with history of childhood cranial nerve palsy, with no obvious deficit, history of headaches, and history of learning disorder. Dr.

Barber opined that the claimant would be capable of walking and standing, bending and kneeling for reasonable periods of time.  (Exhibit 5).

R. 21.  In addition to those impressions cited by the ALJ, Dr. Barber noted that although Plaintiff complained of weekly headaches and blurred vision, she was not taking any medication, she had normal speech, no obvious neurological deficits or defects, intact nerves, normal neurological functioning, sensation, gross motor skills, no memory deficit,  stream of thought was adequate with no flight of ideas or hesitant thinking.  R. 274-75.

The ALJ also addressed the various psychologists' findings regarding frequent headaches. R. 205, 238, 279.  As the Commissioner points out, the portions of the psychologists' records on which Plaintiff relies are not based on objective findings regarding headaches or any other physical problems, but were based on Plaintiff's (or her mother's) statements of Plaintiff's subjective complaints or descriptions of her reported medical history.  R. 205 (Dr. Ludvigh – July 2008); R. 238 (Dr. Harrison – school psychologist – April 2002); R. 279 (Dr. Graham – July 2007).  The ALJ discussed the psychologists' records:

> The claimant also underwent a consultative psychological evaluation in July 2007. During the evaluation, the claimant obtained a verbal IQ score of 70; performance IQ score of 73; and full scale IQ score of 69.  Malcolm Graham, Ph.D. indicated that the claimant had previously undergone testing in 2002 [at age 12] in which she obtained a verbal scale IQ score of 87; performance scale score of 78; and full scale IQ of 81. He noted that there was no explanation for her dramatic decrease in intellectual functioning.  The claimant was diagnosed with Borderline intellectual functioning. Dr. Graham indicated that the claimant's Global Assessment of Functioning (GAF) score was 65-75.  Dr. Graham found that the claimant had no problems in attention or concentration and there were no problems noted in her recent or remote memory. there were also no behavioral indications of anxiety, depression, or of thought disorder. (Exhibit 6F).
>
> * * *
>
> [T]he claimant and her mother indicated that the claimant is unable to work due to limited mental capacity.  However, the evidence indicates that the claimant is not as limited as suggested by her scores.  When Dr. Graham evaluated the claimant, he

> indicated that she had no problems in attention or concentration, and there were no
> problems noted in her recent or remote memory.  The claimant was found to be
> functioning in the borderline range based on her current IQ, the examination of Dr.
> Graham and her extensive activities of daily living

R. 21-22, 25 (citing 278-82).  Dr. Graham noted that Plaintiff reported her headaches lasted two to

three hours if she took her medication "in time."  R. 279, 280-81.

Plaintiff's treating neurologist, Dr. Carinci, diagnosed her with mixed tension vascular

headaches.  R. 328.  She told Plaintiff's mother that Plaintiff "seems to be functioning pretty well for

the type of cognitive issues that these kids tend to have," but Dr. Carinci would "be more than happy

to secure an evaluation for her" at University of Florida-Shands Hospital for Williams Syndrome, a

condition Plaintiff's mother believed Plaintiff to have.  R. 328.  The result of that testing were that

Plaintiff did not have Williams Syndrome.  R. 355.  The ALJ discussed Dr. Carinci's findings:

> In December 2007, the claimant underwent a neurologic consultation for her
> complaints of headaches.  She was noted to have had headaches all of her life.  The
> claimant alleged that 4 times a week she had severe headaches that generally occurred
> around the temples and eyes. she complained that she had significant light and sound
> sensitivity.  On neurological examination, the claimant had Duane syndrome type 1
> on the right.  There was retraction of the globe on adduction with slight impairment
> of abduction with upgaze.  The clinical impression was that the claimant had mixed
> tension vascular headaches.  Stephanie Carinci, M.D. indicated that the claimant had
> a combination of tension type headaches as well as headaches that were more
> migrainous in nature.  She indicated that she thought the claimant would benefit from
> prophylaxis.  The claimant had an MRI that showed no acute intracranial findings.

R. 22 (citing R. 328-36).

Plaintiff saw Dr. Carinci for a number of problems due to headaches.  R. 334.  In December

2007, Plaintiff reported to Dr. Carinci that she got headaches three to four times a week that caused

nausea but no vomiting, which are often triggered by heat, bright lights, odors, and her period.  R.

333-34.  Plaintiff reported dealing with her headaches through rest, Motrin, and caffeine.  R. 333.  Dr.

Carinci advised preventive care with a better diet and prescribed Midrin and Verapamil.  R. 335.  She

noted that it was possible that hypoglycemia was triggering a lot the headaches because Plaintiff did not eat in the morning, thus she might naturally improve just by eating more regularly. R. 335. Records from 2008 included brain MRIs from January 2008 that showed no abnormal or pathologic findings. R. 329-32. In March 2008, Dr. Carinci noted negative MRI results and assessed Plaintiff with normal functioning; Dr. Carinci suggested that Plaintiff establish care with a good internist who might begin to do some work-up locally – she would see Plaintiff back when her mother was ready to pursue more aggressive interventions for her headaches. R. 328. Plaintiff reported taking only over-the-counter medication as necessary. R. 328.

> As to Dr. Perszyk, the ALJ noted;
>
> When seen at the University of Florida Pediatric Multispeciality Center in November 2008, the claimant was evaluated for any genetic causes for her impairments. Anthony Perszyk, M.D. indicated that he reviewed records indicating that the claimant's functional IQ testing was in the range of 55 to 60. It was noted that she was very good with her social skills and memorization. She had worked with the elderly. Dr. Perszyk indicated that the claimant's family had a lot of members with dyslexia and learning difficulties. Individuals in her family had also shown clinodactyly of the fingers with short hands and feet. The claimant also had a history of headaches with nausea and vomiting. She also complained of fatigue at times. Her family indicated that taking certain precautions helped with her migraine headaches. (Exhibit 15F).

R. 22. Plaintiff's genetic testing in November 2008 to further evaluate her headaches and mental problems resulted in no abnormalities. R. 339, 350-52. Although Dr. Perszyk noted Plaintiff's complaint of getting headaches at her initial evaluation (R. 339), he also noted that her headaches seemed to worsen when she ate less frequently but sleeping and caffeine helped control them. R. 339-40. In a February 2009 follow-up, Dr. Perszyk found lab results indicated no metabolic cause for Plaintiff's headaches and advised further MRI analysis. R. 355.

The ALJ properly considered the medical evidence regarding Plaintiff's headaches in finding that Plaintiff's headaches were a severe impairment. R. 21. As part of this determination, the ALJ

considered Plaintiff's credibility as to her symptoms and found Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent they were inconsistent with the residual functional capacity the ALJ assessed.  Pain is a non-exertional impairment.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1528.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote*, 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

The ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels, avoiding ladders, scaffolds, and extremely heavy and dangerous or moving machinery, and limited to simple unskilled work.  R. 23.  Although the ALJ did not refer to the Eleventh Circuit's pain standard as such, he clearly was aware of the governing standards for evaluating subjective complaints because he cited the applicable regulations and Social Security Ruling ("SSR") 96-7p.  R. 23.  *See Wilson v. Barnhart*, 284 F.3d 1219, 1225-26 (11th Cir. 2002) (per curiam) (ALJ properly applied the Eleventh Circuit pain standard even though he did not "cite or refer to the language of the

three-part test" as "his findings and discussion indicate that the standard was applied"). Moreover, the ALJ complied with those standards. He obviously determined that plaintiff had an objective medical condition that could give rise to the alleged symptoms, because otherwise the ALJ would not be required to assess the credibility of the alleged complaints. The ALJ found:

> At the hearing, the claimant testified that her only work history is a 3 day stint as a dishwasher. She was fired and replaced by someone who was faster. She indicated that she could not have continued the job due to her headaches. She takes Excedrin for her headaches. The claimant indicated that she has been enrolled in vocational rehabilitation classes. She continues to have headaches with blurred vision, nausea, and stiffness. She also has earaches from her headaches. Regarding her activities of daily living, the claimant stated that she watches television, plays on the computer and talks on the telephone. If she uses the computer for more than 30 minutes to an hour, the screen starts to bother her. She also does chores. She goes places with her mother, but is able to follow directions.

> The claimant's mother testified that the claimant was on benefits for mental retardation. She indicated that she cannot function 3-4 days out of the week. She exhibits inappropriate behavior and a lack of ability to comprehend in certain situations. Ms. Wells testified that the claimant has dwarfism, hypoglycemia, and migraines and is being tested for silent seizures. She noted that the claimant also has problems with her heart and liver, but has not been placed on medication. She indicated that the claimant's chores include emptying and filling the dishwasher, cleaning her room, and taking her dirty clothes to the laundry. She indicated that the claimant has to be told to do her chores.

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

> The undersigned finds the claimant's allegations regarding her symptoms and limitations not credible to the extent she claims she is precluded from all work activity. The objective medical evidence in the record fails to establish an underlying medical condition that could reasonably be expected to produce incapacitating pain. Despite the claimant's allegations of incapacitating pain due to migraine headache, no doctor has found that she needed anything other than conservative treatment. She admits that she treats her headaches with over the counter medication. Her mother also indicated that taking preventative measures helps with preventing headaches from starting. The claimant indicated that she had problems with her vision, but only when she had headaches and a vision test showed normal uncorrected vision. Objective

testing has not revealed the etiology of her headaches. Additionally the claimant has no other physical findings which would limit her functional ability. Dr. Barber's consultative examination of the claimant was within normal limits. The claimant's mother indicated that she has heart and liver problems. She admitted that she is not on medication for these impairments. The claimant's neurologist indicated that she had excellent compensation for her Duane's Syndrome and she did not have diplopia unless she had a headache. The claimant's rather extensive daily activities indicated that she is not significantly limited by her Dwarfism. Although the undersigned recognizes that the claimant has some degree of pain, the objective and other evidence simply does not establish that the pain is as disabling as the claimant alleges.

The claimant's credibility is further diminished by her inconsistent statements regarding her activities of daily living that include doing household chores such as cleaning. She watches television and is able to use a computer. When evaluated by Dr. Graham, the claimant indicated that she spends most of her day doing household chores, watching television, playing video games, riding her bike, talking on the phone, visiting friends and swimming. In addition, the claimant has recently been referred to vocational rehabilitation where she will be receiving training. Such level of activity is not consistent with a complete inability to work.

\* \* \*

No treating or examining physician has said the claimant is completely unable to work. The state agency medical consultant most recently concluded that the claimant did not have any exertional limitations. Regarding her mental functioning, the state agency consultant concluded that the claimant would benefit from extra supervision when learning new tasks and was limited to easier tasks. It was noted that she could carry out simple tasks. The claimant could maintain concentration and attention for routine tasks. These opinions are given significant weight as they are supported by the objective medical evidence. (Exhibits 7F, 8F, and 9F).

R. 25.

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the

testimony be accepted as true. *Foote*, 67 F.3d at 1561-62; *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Here, the ALJ was very specific about the reasons he found Plaintiff's subjective statements regarding her headaches not entirely credible. The ALJ's reasons included inconsistencies between her reports and Dr. Graham's testing results, Plaintiff's participation in vocational rehabilitation testing, and the variety and quality of her "rather extensive" activities of daily living which included using the computer, doing household chores, watching television, playing video games, riding her bike, talking on the phone, visiting friends and swimming. These are factors the ALJ is directed to consider. 20 C.F.R. §§ 404.1529; 416.929. The ALJ's finding that Plaintiff's headaches were not disabling was based on substantial evidence.

**B.     Testimony of Martha Wells**

Plaintiff argues that the ALJ erred in assessing the testimony of Martha Merrill Wells, Plaintiff's mother (R. 376) which she argues supports a finding of disability, and is crucial to the case. She argues that, having observed and taken care of Plaintiff her whole life, Martha Wells "is in a unique position to give testimony about Plaintiff's limitations in daily life, employment, schoolwork, and social functioning." Doc. 13. The Commissioner argues that the ALJ implicitly rejected Martha Wells' testimony when he rejected Plaintiff's testimony, which the Commissioner argues is sufficient.

An ALJ must "state specifically the weight accorded each item of evidence and the reasons for his decision." *Gibson v. Heckler,* 779 F.2d 619, 623 (11th Cir. 1986). A family member's testimony is evidence of a claimant's subjective allegations of pain or other complaints. *See Tieniber v. Heckler,* 720 F.2d 1251, 1253 (11th Cir. 1983). However, where an ALJ fails to make an explicit credibility determination as to a family member's testimony, no error will result if the credibility determination was implicit in the rejection of the claimant's testimony. *Allen v. Schweiker,* 642 F.2d

-14-

799 (5th Cir. 1981) (Unit B); *Harrington v. Astrue*, No. 8:08-cv-1702-T-TBM, 2009 WL 3232347,

*7 (M.D. Fla. Sept. 29, 2009) (holding no error where plaintiff's mother's testimony reveals that it

largely corroborated plaintiff's testimony which the ALJ explicitly discounted).

Martha Wells testified at the hearing that Plaintiff is unable to function three to four days of

the week from headaches, has inappropriate social behavior (R. 376), is unable to handle her own

money, and is unable to apply for jobs (R. 381). If unable to apply for jobs, or work three to four days

a week, or behave appropriately, then she cannot find or work a normal workweek or maintain

employment on a reliable basis. The Commissioner contends that  the ALJ considered all of

Plaintiff's medical records and properly found her records failed to show significant limitations due

to her alleged headaches and mental symptoms. R. 19-25.

Plaintiff argues that the ALJ erred in failing to make a credibility finding on Martha Wells'

testimony regarding debilitating headaches, which is a critical issue (R. 24-25), by finding that Martha

Wells' testimony regarding Plaintiff's inappropriate behavior was "not confirmed by reports from

outside sources or school records" (R. 25), and by ignoring Martha Wells' testimony that the claimant

is unable to function three to four days a week due to headaches (R. 24-25), and by failing to consider

Martha Wells' testimony regarding headaches, and Plaintiff's inability to work full time, handle

money, or apply for jobs.

Plaintiff's arguments regarding the subjective evidence of headaches –whether based on her

mother's testimony or her own – was addressed above. Moreover, the ALJ did not ignore Plaintiff's

mother's testimony, he specifically addressed several of her statements about Plaintiff's symptoms

in discounting those statements. R. 24-25. The ALJ discussed testimony from Plaintiff's mother in

reviewing all the testimony concerning the intensity, persistence, and limiting effects of her

symptoms. R. 24.

In arguing that Martha Wells' testimony supported a disability finding and limited vocational opportunities, Plaintiff cites Dr. Ludvigh's notes that she could be limited in job searching and vocational applications (R. 208).  Plaintiff also points to the vocational evaluation conducted for the Florida Division of Vocational Rehabilitation which recommended that Plaintiff work only part-time. R. 226.

Plaintiff also notes that Dr. Dasai noted immature behavior and interaction, and limited cooperation (R. 232), and a psychological assessment which noted that Plaintiff "makes inappropriate responses to conversation and questions." R. 193.  These observations are from testing completed when Plaintiff was twelve years old, noting Plaintiff made inappropriate responses to questions and showed immature behavior.  R. 193, 232.     Subsequent testing as an eighteen-year-old showed normal mental status findings, unremarkable behavioral indications, with only mild social and emotional delays.  R. 21-22, 208, 275, 280. Plaintiff reported having a boyfriend and having good relationships with several friends;  (R.208).  In November 2008, Plaintiff reported working with the elderly and beginning vocational training, which indicated very good social skills.  R. 339.

She also points to the opinions of state consultants who noted *moderate* – not "significant" as Plaintiff contends – limitations in Section I of the Mental RFC Assessment.  *See* R. 291-92, 309-10 (ability to complete a normal workday/week, the ability to interact appropriately with the public; sustain an ordinary routine without special instruction).  The state agency psychologists opined Plaintiff could do simple tasks, which is consistent with the ALJ's limitation of Plaintiff to simple, unskilled work.  R. 293, 311. The ALJ considered these opinions and properly incorporated them in Plaintiff's RFC.

## C. Review of the Appeals Council decision

Plaintiff contends that the Appeals Council erred in not reversing the ALJ's decision based on a letter from the Doctor Perszyk in the Division of Medical Genetics – Pediatrics at the University of Florida which discussed genetic testing results submitted to the AC *after* the ALJ's decision. When a plaintiff submits additional evidence to the Appeals Council and the Appeals Council denies review, the court must determine whether the Commissioner's decision is supported by substantial evidence on the record as whole. *See Ingram v. Commissioner of Social Security*, 496 F.3d 1253, 1262, 1266 (11th Cir. 2007); *Hummel v. Astrue*, No. 8:06-CV-725-T-EAJ, 2007 WL 2492460, *7 (M.D. Fla. Aug. 30, 2007) (under *Ingram*, the court reviews whether the decision to deny benefits is supported by substantial evidence in the record as a whole, including evidence submitted to the Appeals Council).    Plaintiff attaches a copy of Dr. Perszyk's May 6, 2009 letter that her counsel submitted  to the AC as new[3] and material evidence of genetic testing results after the ALJ's April 16, 2009 decision (R. 16).  Plaintiff argues that the AC erred in not considering this evidence and not listing it as new evidence when it issued its Notice of Appeals Council Action on October 22, 2009 (R. 4-7) even though it mentioned other new evidence that was submitted separately (R. 4-10).

The genetic testing was conducted on Plaintiff by the University of Florida Division of Pediatric Genetics on May 6, 2009.  According to Plaintiff, her counsel obtained a copy of the results of this testing and sent it to the Appeals Council on July 7, 2009.  Doc. 13-1.  Plaintiff is correct that Dr. Perszyk's May 6, 2009 letter is not in the administrative record, although it appears to have been received by the AC on July 10, 2009 in the Mail and Messenger Branch.  Doc. 13-1 at 5.

Plaintiff argues that the evidence is material because it is objective medical evidence confirming the results of genetic testing in support of the existence of underlying impairments which

---

[3]The Commissioner does not dispute that the evidence meets the criteria as "new."

would reasonably be expected to cause Plaintiff' disabling condition. Dr. Perszyk stated that the

genetic testing confirmed that Plaintiff had a genetic disorder:

> On reviewing all these test results for this young lady, she does have abnormal labs
> in the past and significant short stature with cognitive delays with a functional IQ of
> less than 70. . . .
>
> There was no Williams syndrome in this young lady . . . This testing did confirm a
> deletion of chromosome #9 . . . This is consistent with relatively low IQ, but otherwise
> healthy physical activity. This would explain this young lady's developmental
> problems, her lack of full understanding of concepts, and long-term disability from a
> cognitive standpoint. This chromosome abnormality clearly defines her as having a
> genetic disorder accounting for her low IQ and should qualify her for disability
> throughout her adult years. . . .This young lady may be more likely to have recurrent
> infections and may need more antibiotics that the average person because of her
> chromosome abnormality. . . . At the present time, I am pleased with her progress and
> development.

Doc. 13-1 at 6-7.

The Commissioner argues that, given the record as a whole, including this evidence submitted

to the AC, substantial evidence supports the ALJ's decision.  The Commissioner contends that the

May 6, 2009 genetic testing record does not provide a basis for changing the ALJ's decision because,

as it is dated nearly a month *after* the ALJ's April 16, 2009 decision, it shows no deterioration in

Plaintiff's condition through the ALJ's decision, which is the chronologically relevant period for the

AC to review. *Id.*; 20 C.F.R. § 416.1470(b).

The Commissioner further argues that Dr. Perszyk's May 6, 2009 letter fails to show greater

limitations than those the ALJ assessed, but merely provides a genetic explanation for Plaintiff's

morning stiffness problems, which can be managed with exercise, and for her history of low IQ scores

and cognitive delays, which the ALJ had already reviewed, and are not inconsistent with the ALJ's

findings and decision. R. 21-23. The Court agrees. Dr. Perszyk's letter merely explains the diagnosis

for Plaintiff's borderline intellectual functioning, which the ALJ found to be severe. Moreover,

although Dr. Perszyk described Plaintiff as having a functional IQ of less than 70 – and her IQ had

been assessed as 56 at age 12 (R. 98) (before she was retested at her mother's insistence),  the next

year with a verbal scale IQ of 87, and full scale IQ of 81 (R. 281) – the ALJ had the benefit of Dr.

Graham's testing of Plaintiff in July 2007 at age 18, and assessed her as having a Verbal

Comprehension score of 76, which was "more representative of her overall level of functioning in the

verbal area." R. 280.  As the ALJ commented at the hearing:

> There's a significant problem with the 56 IQ based on the 78 IQ that's in there and the
> 77 to 86 that's in there, and you can't fake on an IQ test, and so I think maybe there's
> a little bit of under estimation of this gal's IQ, and I mean a 56 is noticeable. [As a]
> mater of fact, it glares in your face if you see someone with that kind of an IQ, and
> that young lady is not there. I have no trouble accepting the one [of] 78 as probably
> more with the program and, nonetheless, that's obviously not good but it's not
> devastating either.  A 56 is devastating, and actually with a 56 we wouldn't even be
> here.

R. 383.  Dr. Perszyk did not opine that Plaintiff had any additional functional limitations impacting

her ability to work, but rather discussed only the cause of her "cognitive" or development problems.

The ALJ considered Plaintiff's borderline intellectual functioning and included it in his determination

of Plaintiff's RFC.  Based on the medical evidence submitted to the AC and comparing it with the

record as a whole, substantial evidence supports the ALJ's findings and conclusion that Plaintiff was

not disabled.

### D.    Application of the grids

Plaintiff claims that because she suffered from headaches and borderline intellectual

functioning, she had nonexertional limitations, precluding the application of the grids and requiring

VE testimony.

Once the ALJ finds that a claimant has not performed past relevant work, the burden of proof

shifts to the Commissioner to establish that the claimant could perform other work that exists in the

national economy. *Foote*, 67 F.3d at 1558. In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the "grids." *Foote*, 67 F.3d at 1558. Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). The Commissioner argues in a vague and circular fashion that the ALJ fulfilled this burden at step five, by relying on the Grids, thus, the burden then fell back on Plaintiff to show she could not perform jobs that existed in the national economy and Plaintiff failed to carry her burden of producing evidence showing she was disabled. Doc. 14 at 19-20. Although the Commissioner failed to address specifically Plaintiff's headaches as a non-exertional impairment, he discussed Plaintiff's lack of limitations from headaches at length. However, the Commissioner has not addressed at all the issue of Plaintiff's borderline intellectual functioning and the specific limitations associated therewith as a non-exertional impairments precluding use of the Grids.

Exclusive reliance is not appropriate "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walter v. Bowen*, 826 F.2d 996, 1002-3 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a VE. *Foote*, 67 F.3d at 1559. It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a VE to establish whether the claimant can

perform work which exists in the national economy.  In any event, the ALJ must make a specific

finding as to whether the non-exertional limitations are severe enough to preclude a wide range of

employment at the given work capacity level indicated by the exertional limitations.  *Foote*, 67 F.3d

at 1559.

In this case, the ALJ properly determined that Plaintiff did not suffer from disabling headaches;

Plaintiff's statements were properly discredited by the ALJ as explained above.  In addition, Dr.

Preszyk found Plaintiff's verbal skills to be above average and her memory to be "excellent" (R. 340)

and Dr. Graham found no problems in her recent or remote memory.  R. 281.  Plaintiff graduated from

high school; she was in ESE classes due to a mathematics disability and was not able to pass the

FCAT, but she did receive an FCAT waiver and graduated with a standard diploma.  R. 205.  Plaintiff

(or her mother) reported to SSA that she had passed classes in Chemistry, Biology, and Geometry and

she planned to get her GED.  R. 175.  The ALJ's consideration of Plaintiff's allegations of headache

pain and lack of functional limitations was based on substantial evidence.

However, as argued by Plaintiff, borderline intellectual functioning has been held to be a non-

exertional impairment precluding the ALJ's reliance on the grids.  *See, e.g., Williams v. Massanari*,

Case No. CA 00-0787-BH-C, 2001 WL 530458 (S.D. Ala. May 10, 2001) and cases cited therein.

In determining Plaintiff's RFC (R.23), the ALJ did limit Plaintiff what he characterized as the

"non-exertional limitation" of "simple, unskilled work" apparently based on the opinions of the state

agency psychologists:

> Further, the claimant and her mother indicated that the claimant is unable to work due
> to limited mental capacity.  However, the evidence indicates that the claimant is not
> as limited as suggested by her scores.  When Dr. Graham evaluated the claimant, he
> indicated that she had no problems in attention or concentration, and there were no
> problems noted in her recent or remote memory.  The claimant was found to be
> functioning in the borderline range based on her current IQ, the examination of Dr.
> Graham and her extensive activities of daily living.  The claimant's mother reported

that the claimant exhibited inappropriate behavior at times.  This was not confirmed by reports from outside sources or school records. . . .

Regarding her mental functioning, the state agency consultant concluded that the claimant would benefit from extra supervision when learning new tasks and was limited to easier tasks.  It was noted that she could carry out simple tasks.  The claimant could maintain concentration and attention for routine tasks.  These opinions are given significant weight as they are supported by the objective medical evidence.

R. 25.

However, even though the vocational expert was at the hearing (*see* R. 382-83), the ALJ only asked him about limiting Plaintiff with "seizure precautions," *i.e.*, avoiding driving, scaffolds, machinery, etc., and the impact on the light and sedentary unskilled occupations.  R. 382.  The VE replied that such limitations would have a minimal impact.  R. 382.  The ALJ failed to ask the VE a hypothetical a question regarding the limitations of "simple, unskilled work" or including the other moderate limitations set forth in the state agency psychologist mental RFC assessments on which he relied. R.  23; R. 291-307 (moderate limitations in the ability to understand and remember detailed instructions, carry out detailed instructions, and sustain an ordinary routine without special supervision, complete a normal workweek, and set realistic goals or make plans independently of others;  functionally limited with difficulties in maintaining concentration, persistence or pace); R. 309-26 (moderate limitations in the ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workweek, interact appropriately with the general public, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others; functionally limited with restrictions of activities of daily living and difficulties in maintaining concentration, persistence or pace).

The court held in *Williams*:

It is all too clear that borderline intellectual functioning is a nonexertional impairment. *Muncy v. Apfel*, 247 F.3d 728, 2001 WL 360626 * 6 (8th Cir. April 12, 2001) ("Even assuming that Muncy's IQ score of 84 is valid, it nevertheless represents borderline intellectual functioning. . . . Such a score indicates a 'significant nonexertional impairment that needed to be considered by the VE.' "); *Holz v. Apfel*, 191 F.3d 945, 947 (8th Cir.1999) ("Holz's borderline intellectual functioning . . . was a significant nonexertional impairment that needed to be considered by the VE [.]"); *Foreman v. Callahan*, 122 F.2d 24, 26 (8th Cir.1997) ("This Court . . . has 'previously concluded that borderline intellectual functioning . . . is a significant nonexertional impairment that must be considered by a vocational expert." "); *Lucy v. Chater*, 113 F.3d 905, 908 (8th Cir.1997) ("We have previously concluded that borderline intellectual functioning, if supported by the record as it is here, is a significant nonexertional impairment that must be considered by a vocational expert."); see also *Allen, supra*, 880 F.2d at 1201 & 1202 (noting the ALJ's finding that one of plaintiff's severe impairments was borderline intellectual functioning and concluding that "[t]he ALJ should have elicited testimony from a vocational expert to interpret and evaluate appellant's medically documented non-exertional psychological and emotional limitations, which included serious limitations in the exercise of judgment, making occupational adjustments, dealing with work stresses, concentrating, understanding, remembering, and carrying out job instructions."). Because borderline intellectual functioning is a nonexertional impairment and the ALJ explicitly found that plaintiff can only perform work that does not involve complex instructions, clearly a nonexertional limitation, the ALJ erred . . . first in finding that there are no nonexertional limitations and secondly in failing to make a finding about whether these limitations are severe enough to preclude a wide range of work and application of the grids.

*Williams,* 2001 WL 530458, *3.

As in *Williams*, the ALJ in this case explicitly found that Plaintiff was limited to simple, unskilled work, which he referred to as a nonexertional limitations, but then relied on the Grids without inquiring of the VE whether "simple, unskilled work" or the moderate limitations set forth by the state agency psychologists[4] would preclude a wide range of work and application of the Grids. Accordingly, the ALJ finding as to Step 5, that there was other work in the national economy that Plaintiff could perform based on the Grids, was not based on substantial evidence.

---

[4]In evaluating the RFC of someone already at the "borderline" of intellectual ability, it is important to examine and take into account the specific deficits of the individual and evaluate how each of those deficits affect vocational functioning.

## *IV.  CONCLUSION*

For the reasons set forth above, the ALJ's decision evidence as to Step 5 was not based on substantial evidence.  Accordingly, it is respectfully **RECOMMENDED**  that the Court **REVERSE** and **REMAND** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g), and the Clerk of the Court be directed to enter judgment and thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on January 21, 2011

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Courtroom Deputy